UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:09 CR 96 RWS |
| | ) | |
| ANTHONY RIZZUTI, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM**

Comes now the United States of America, by and through its attorneys, Richard G.

Callahan, United States Attorney for the Eastern District of Missouri, and Robert F. Livergood,

Assistant United States Attorney for said District, and files its response to defendant's

"Sentencing Memorandum."  For its response, the Government states the following:

Defendant was charged in a two-count indictment.  On December 1, 2009, defendant

pleaded guilty to Count Two, Possession of Child Pornography, and the Government agreed to

move for dismissal of Count One, Enticement of a Child, at the time of sentencing.  The parties

agreed that the total offense level was 27 and the determination of defendant's criminal category

shall be left to the Court.  The parties further agreed that "neither party shall request a sentence

above or below the applicable guideline range pursuant to any chapter of the Guidelines, Title

18, United States Code, Section 3553(a), or any other provision or rule of law, unless that

request and facts which support that request are addressed in this document or the request is

made with the consent of both parties."  Neither party is requesting a sentence above or below

the applicable Guideline range.

1

In <u>United States v Haack</u>, 403 F.3d 997 (8th Cir. 2005), the Court of Appeals described the process that the District Court should follow in determining a sentence in light of <u>United States v. Booker</u>, 125 S. Ct. 738 (2005).  The Court should first determine the guideline range based upon all enhancements and the defendant's criminal history.  Second, the Court should determine if any guideline departures apply.  Finally, the Court should determine if the guideline range is reasonable considering all factors listed in Title 18, United States Code, Section 3553(a). <u>United States v. Haack</u>, 403 F.3d at 1002-1003.

Section 3553(a) lists the following relevant factors:

1) the nature and circumstances of the offense and the history and characteristics of the defendant;

2) the need for the sentence imposed --

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3) the kinds of sentences available;

4) the kinds of sentences and the sentencing range established for –

(A) the applicable category of offenses committed by the applicable category of defendant as set forth in the guidelines . . .

5) any pertinent policy statement –

(A) issued by the Sentencing Commission . . .

6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . .

The application of these factors in this case supports a sentence of 70 to 87 months, and in particular, a sentence of 84 months as requested by the Government.

I.    The Nature and Circumstances of the Offense

The defendant pleaded guilty to possession of child pornography in Count Two of the indictment.  Defendant has not pleaded guilty to enticement of a child in Count One of the indictment.

The nature and circumstances of the offense are as follows.  On July 2, 2004, defendant communicated with Evan Pridham, Task Force Officer for the Federal Bureau of Investigation, assigned to the Columbus, Ohio Resident Agency, Cyber Crimes Task Force.  See Presentence Investigation Report ("PSR") at ¶  8.  The communications between defendant and TFO Pridham occurred over the internet while defendant was in Missouri and California and TFO Pridham was in Ohio.  TFO Pridham used the pseudonym of "Allie," a fourteen-year-old female living in Ohio.  Defendant chatted with "Allie" over the internet asking to meet so they could engage in sexual contact.  Id.

On March 23, 2005, during an online-chat between defendant and "Allie," defendant told "Allie" that he wanted her to meet him in San Francisco so that she could perform oral sex on him and engage in sexual intercourse with him.  On March 24, defendant talked on the phone with an employee of the Dublin Police Department who pretended to be "Allie."  During the conversation defendant purchased a Southwest Airlines ticket for "Allie" to fly from Ohio to

California.   The ticket confirmation was emailed to "Allie."  Id.  In April of 2005, defendant

asked "Allie" to masturbate and clean herself with a pair of panties.  He then asked that the

panties be mailed to him.  Id.  When "Allie" refused to send the panties, defendant cancelled the

ticket and stopped communicating with "Allie."  Id.

In January 2007, defendant communicated over the internet with Officer Erica Stough of

the Maryland Heights Police Department, Maryland Heights, Missouri.  Id. at ¶ 9.  Officer

Stough used the pseudonym of "Hannah" and portrayed herself as a fourteen-yearold female.

During an online chat on January 5, 2007, defendant asked, among other things, whether

"Hannah" liked older men.  During the course of their chats, "Hannah" provided defendant with

her cell phone number.  Some of their conversations took place on the computer via the internet,

while others took place on the telephone.  During their conversations between January 2007 and

June 2008, defendant asked if there were hotels near "Hannah's" residence to which he could

take her; he asked if she masturbated and when she replied no he wanted to teach her how;

several times he told "Hannah" that he was horny; he told her he wanted to kiss her all over her

body; he asked her whether she would feel comfortable touching his penis; he asked her if she

would kiss his penis and whether he could lick her vagina and have intercourse with her; and  he

indicated on several occasions that he was masturbating while communicating with her.  Id.

On May 31, 2008, the defendant contacted "Hannah" on the internet and on the cell phone.

On the cell phone he asked "Hannah" if she could sneak out so they could have sexual

intercourse with each other.  Id. at ¶ 10.  He also asked if he could take naked pictures of her

while they were having intercourse.  Id. During the early morning hours of June 1, 2008,

defendant again contacted "Hannah" by cell phone and asked for her address so he could pick

her up.  Officer Stough and Captain Scott Will of the Maryland Heights Police Department, went

to the area where the defendant was to pick up "Hannah."  During their trip, defendant contacted

"Hannah" again by cell phone and said he was nervous about getting in trouble but still wanted

to meet with her.  While defendant was driving around the predetermined location looking for

"Hannah," Officer Stough and Captain Will spotted defendant in his vehicle.  Id.  Defendant was

pulled over by the police and admitted that he was in the area to visit a friend named Hannah.

He was then placed under arrest and searched incident to arrest.  During the search the officers

located four condoms and a camera in his shorts' pockets.  Id.

Defendant was interviewed by Captain Will.  Defendant admitted that he was there to meet

"Hannah" who he believed was a fourteen-year-old girl.  Id. at ¶ 11. He admitted that he

discussed wanting to have oral sex and vaginal intercourse with her.  Id.  He also admitted that

he received emails that contained child pornography.  Id.  Defendant said he believed he deleted

the child pornography images.  Id.

Defendant gave consent to seize and search his computer.  Officers seized a Sony Vaio

Laptop from defendant's address in St. Charles County, Missouri.  It was subsequently

forensically analyzed.  There were more than 20 images and one video of child pornography

found on the hard drive in defendant's computer.  Thus, between May 1, 2008, and June 2, 2008,

the defendant knowingly possessed material that contained images of child pornography that was

produced using materials that traveled in interstate and foreign commerce.

II.    History and Characteristics of the Defendant

Defendant had no criminal history.  PSR at ¶¶ 38 - 42.

III.   Reflect the Seriousness of the Offense,  to Promote Respect for the Law, and to Provide Just Punishment for the Offense

The trafficking in images of the sexual abuse of children is a serious offense and the guidelines reflect the seriousness of the crime.  Too often child  pornography is considered to be "just pictures" without the recognition that they are images of children being sexually abused and those images are then trafficked around the world on the internet.  Even when the perpetrator of the original abuse is imprisoned, the  images of the child's sexual abuse continue to be traded. The child's abuse never ends because the images of the abuse are present in hundreds of locations.

IV.   To Afford Adequate Deterrence to Criminal Conduct and  To  Protect the Public from Further Crimes of the Defendant

Stiff sentences are necessary to reduce or eliminate the market for child pornography and to protect children from becoming victims to feed that market.  The number of child pornography cases has skyrocketed in the last five years and prison sentences are necessary to deter the collection and trade of child pornography.

Defendant asserts, essentially, that "he poses no threat to the public in general or children in particular."  "Sentencing Memorandum" at p. 14.  Although defendant may feel he does not pose a threat, he knew what he was doing was wrong.  A significant prison sentence is needed to prevent the defendant from continuing his use of child pornography.

Luis Rosell, Psy.D., prepared an evaluation of the defendant and reported his findings in the Psychological Evaluation ("Rosell Report"), which was filed by the defendant with the Court.  Defendant relied on the Rosell Evaluation in his Sentencing Memorandum.  During the course of his evaluation, defendant denied that he was sexually stimulated by child pornography.

"Rosell Evaluation" at 6.  Defendant told Dr. Rosell that he was disgusted by the images, not

aroused by them.  Id.  A recent article concerning child pornography offenders note:

> Based on our clinical observations . . . only a very small minority of offenders (e.g.,
> psychopaths) who commit child pornography crimes are motivated by non-sexually deviant
> interests; rather, most are motivated by a pre-existing sexual interest in minors.  In our
> work with hundreds of Internet child pornography offenders in treatment, the vast majority
> of those who initially denied paraphilic interest subsequently acknowledged their
> pre-existing and longstanding sexual interest in minors.

Michael L. Bourke & Andres E. Hernandez, *The 'Butner Study' Redux: A Report of the*

*Incidence of Hands-on Child Victimization by Child Pornography Offenders*, 24 J. FAM. VIOL.

183, 185 (2009).

Dr. Rosell wrote in his report that defendant remains at a low risk of hands-on offending

because he has not previously engaged in that type of behavior.  "Rosell Report" at 17.

However, Bourke, et. al, in their study of child pornography offenders wrote:

> Our findings suggest that online criminal investigations, while targeting so-called "internet
> offenders," likely have resulted in the apprehension of concomitant child molesters.  In
> fact, if it had not been for their online criminality, these offenders may not otherwise have
> come to the attention of law enforcement.  Upon being discovered, these offenders tend to
> minimize their behavior.  They may attribute their search for child pornography to
> "curiosity" or a similar benign motivation.  They may "accept responsibility" only for
> those behaviors that are already known to law enforcement, but hide any contact sexual
> crimes to avoid prosecution for these offenses, or to avoid the same and humiliation that
> would result from revealing their deviance to family, friends and community.  Only later
> do the majority of sex offenders who enter treatment acknowledge that they were not, as
> they initially claimed, merely interested in sexual images involving children; they were
> (and are) sexually aroused by children.
>     Further, as prior research and our current findings suggest, it appears that the
> manifestations of their deviant sexual arousal was not limited to fantasy.  Rather, when an
> opportunity arose (either incidentally or as a result of planned, predatory efforts), many
> offenders molested or raped children, and engaged in a variety of other sexually deviant
> behaviors.

Michael L. Bourke & Andres E. Hernandez, *The 'Butner Study' Redux: A Report of the Incidence of Hands-on Child Victimization by Child Pornography Offenders*, 24 J. FAM. VIOL. 183, 189-90.

Finally, although Dr. Rosell said that defendant did not engage in "hands-on offending," there is evidence that defendant sought it out.  Defendant engaged in internet chats with "Allie" and "Hannah."  Supra.  During the course of those conversations he indicated that he wanted to engage in sexual activity with them.  He went so far as to buy "Allie" an airline ticket and went to meet with "Hannah."  He subsequently cancelled the airline ticket for "Allie" after "she" refused to send him her underwear.  As far as meeting with "Hannah," defendant was arrested near where the meeting was to take place.

V.    Avoid Unwarranted Sentence Disparities among Defendants

Section 3553(a) also directs courts to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  The Section 3553(a) factors support a sentence within the guideline range of 70 to 87 months.

VI.    The Federal Sentencing Guidelines

Defendant  urges this Court to disregard the child pornography sentencing guidelines because "§2G2.2 does not provide 'a rough approximation of the sentences that might achieve § 3553(a)'s purposes.'"  "Sentencing Memorandum" at 12.  The defendant also asserts that the child pornography guidelines are not based on an empirical approach nor national experience. Id. at 3-4.  The current child pornography guidelines have evolved over time in response to the increase in the amount of child  pornography on  the internet and the improved understanding of

8

the lasting, devastating effects that the abuse has upon the children involved.   Contrary to the

defendant's assertions, the Commission has conducted empirical research:

> Rather than cede its responsibility, the Commission instead appears to have gone
> above and beyond to justify its amendments.  Far from failing to rely on empirical
> data and its own expertise, the Commission has conducted formal studies whenever
> possible and has conducted extensive analyses to fulfill its statutory obligations.
> Have politicians interfered?  There can be no question that they have interfered.
> However, at the same time, Congress' actions could be viewed as a necessary
> response to a crime that was spiraling out of control.  As internet access grew across
> this county, so did the online community of pedophiles that supports the market for
> child pornography.  Rather than remain silent, Congress acted.  In turn, **the
> Commission used empirical data and its own expertise to craft the appropriate
> Guideline amendments**.

United States v. Cunningham, 680 F.Supp. 844, 851 (N.D. Ohio 2010) (emphasis added).

In 1996, when increasing punishment for child pornography offenses,  Congress made

the following findings as to the reasons for H.R. 1240:

> SUBSECTION 1. FINDINGS.
> Congress finds that—
>
> (1) the use of children in the production of sexually explicit material, including
> photographs, films, videos, computer images, and other visual depictions, is a form of
> sexual abuse which can result in physical or psychological harm, or both, to the children
> involved;
> (2) where children are used in its production, child pornography permanently records the
> victim's abuse, and its continued existence causes the child victims of sexual abuse
> continuing harm by haunting those children in future years;
> (3) child pornography is often used as part of a method of seducing other children into
> sexual activity; a child who is reluctant to engage in sexual activity with an adult, or to
> pose for sexually explicit photographs, can sometimes be convinced by viewing depictions
> of other children "having fun" participating in such activity;
> (4) child pornography is often used by pedophiles and child sexual abusers to stimulate and
> whet their own sexual appetites, and as a model for sexual acting out with children; such
> use of child pornography can desensitize the viewer to the pathology of sexual abuse or
> exploitation of children, so that it can become acceptable to and even preferred by the
> viewer;
>  . . .
> (7) the creation or distribution of child pornography which includes an image of a
> recognizable minor invades the child's privacy and reputational interests, since images that

9

are created showing a child's face or other identifiable feature on a body engaging in sexually explicit conduct can haunt the minor for years to come
. . .
(10)(A) the existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children; and
(B) it inflames the desires of child molesters, pedophiles, and child pornographers who prey on children, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials;
(11)(A) the sexualization and eroticization of minors through any form of child pornographic images has a deleterious effect on all children by encouraging a societal perception of children as sexual objects and leading to further sexual abuse and exploitation of them; and
(B) this sexualization of minors creates an unwholesome environment which affects the psychological, mental and emotional development of children and undermines the efforts of parents and families to encourage the sound mental, moral and emotional development of children;
(12) prohibiting the possession and viewing of child pornography will encourage the possessors of such material to rid themselves of or destroy the material, thereby helping to protect the victims of child pornography and to eliminate the market for the sexual exploitative use of children; and
(13) the elimination of child pornography and the protection of children from sexual exploitation provide a compelling governmental interest for prohibiting the production, distribution, possession, sale, or viewing of visual depictions of children engaging in sexually explicit conduct, including both photographic images of actual children engaging in such conduct and depictions produced by computer or other means which are virtually indistinguishable to the unsuspecting viewer from photographic images of actual children engaging in such conduct.

OMNIBUS CONSOLIDATED APPROPRIATIONS ACT of 1997, PL 104-208, 110 Stat 3009,

Section 121 (September 30, 1996).

During the debate in the Senate, Senator Grassley specifically spoke about the

need to make penalties for various violations of child pornography statutes stronger when a

computer was used:

H.R. 1240 seeks to enhance prison time as well as fines for child pornographers who use computers to trade in child pornography. I believe that this penalty enhancement is an important measure and the Grassley-Hatch-Thurmond amendment merely clarifies what the House intended to do in order to remove any possible confusion in the future.

Computers are now the preferred business forum for child pornographers. Due to modern technology, predatory pedophiles sell, purchase and swap the most vile depictions of children engaged in the most outrageous types of sexual conduct.

Simply put, child pornography on computers is dangerous and must be stopped. In the past, whenever State or Federal law enforcement agents arrested a child pornographer, or ring of child pornographers, they seized and then destroyed the child pornography. This kept child pornography out of the hands of child molesters and preserved the privacy of the children who had been so callously exploited. **But now, because of digital computer technology, it is nearly impossible to actually destroy child pornography. That means there will be more child pornography for child molesters and less privacy for abused children.** We in Congress must do something.

H.R. 1240 and the Grassley-Hatch-Thurmond amendment would discourage child pornographers from using computers to trade in child pornography. And when the U.S. Sentencing Commission reports to us this fall on how computer child pornographers are being punished, I will take a close look to see if there is anything the Senate can do to provide even more protection to children.

141 Cong. Rec. S5509-02. (emphasis added).

The current guidelines are largely based upon the 2003 PROTECT Act (Prosecutorial

Remedies and Tools against the Exploitation of Children Today).  The Act was passed after

extensive findings by Congress in response to the explosion of child pornography on the internet.

Congress relied upon the Supreme Court's language in Ferber in adopting the PROTECT Act:

"[T]he use of children as ... subjects of pornographic materials is very harmful to both the children and the society as a whole." S.Rep.No. 95-438, p. 5 (1977), U.S. Code Cong. & Admin.News 1978, p. 42.   It has been found that sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults.  Schoettle, Child Exploitation:  *A Study of Child Pornography*, 19 J.Am.Acad.Child Psychiatry 289, 296 (1980) (hereafter cited as Child Exploitation); Schoettle, *Treatment of the Child Pornography Patient*, 137 Am.J.Psychiatry 1109, 1110 (1980); Densen-Gerner, *Child Prostitution and Child Pornography: Medical, Legal, and Societal Aspects of the Commercial Exploitation of Children*, reprinted in U. S. Dept. of Health and Human Services, Sexual Abuse of Children:  Selected Readings 77, 80 (1980) (hereafter cited as Commercial Exploitation) (sexually exploited children predisposed to self-destructive behavior such as drug and alcohol abuse or prostitution).  See generally Burgess & Holmstrom, *Accessory-to-Sex: Pressure, Sex, and Secrecy*, in A. Burgess, A. Groth, L. Holmstrom, & S. Sgroi, Sexual Assault of Children and Adolescents 85, 94 (1978); V. De Francis, Protecting the Child Victim of Sex Crimes Committed by Adults 169 (1969);  Ellerstein & Canavan, *Sexual Abuse of Boys*, 134 Am.J. Diseases of Children 255, 256-257 (1980); Finch, *Adult*

11

*Seduction of the Child: Effects on the Child*, Medical Aspects of Human Sexuality 170, 185 (Mar.1973);  Groth, *Sexual Trauma in the Life Histories of Rapists and Child Molesters*, 4 Victimology 10 (1979).  Sexual molestation by adults is often involved in the production of child sexual performances.  *Sexual Exploitation of Children*, A Report to the Illinois General Assembly by the Illinois Legislative Investigating Commission 30-31 (1980). When such performances are recorded and distributed, the child's privacy interests are also invaded.  New York v. Ferber, 458 U.S. 747, 760 n.10 (1982).

As one authority has explained:

"[P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution.  Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place.  A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography."  *Shouvlin, Preventing the Sexual Exploitation of Children:  A Model Act*, 17 Wake Forest L.Rev. 535, 545 (1981). See also *Child Exploitation* 292 ("[I]t is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotional repercussions");  *Note, Protection of Children from Use in Pornography: Toward Constitutional and Enforceable Legislation*, 12 U.Mich.J. Law Reform 295, 301 (1979) (hereafter cited as Use in Pornography) (interview with child psychiatrist) ("The victim's knowledge of publication of the visual material increases the emotional and psychic harm suffered by the child"). Thus, distribution of the material violates "the individual interest in avoiding disclosure of personal matters."  Whalen v. Roe, 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977).   Respondent cannot undermine the force of the privacy interests involved here by looking to Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), and Smith v. Daily Mail Publishing Co., 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979), cases protecting the right of newspapers to publish, respectively, the identity of a rape victim and a youth charged as a juvenile offender.   Those cases only stand for the proposition that "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need ... of the highest order."   Id., at 103, 99 S.Ct., at 2671.  Ferber, 458 U.S. 758, n.9.

Thus, Congress carefully considered the harm  from  internet traffic of child pornography images and chose to increase the penalties in an attempt to reduce the market in these images.

Since 2004, Congress has continued to monitor the evolution of child pornography offenses, particularly given the continuing expansion of the internet and evolving technological issues that shape the production and dissemination of child pornography.  The information it has

reviewed reinforces its identification of the internet as the new frontier in the trading, viewing

and receiving of images of child pornography.  For instance, in 2006, the House Committee on

Energy and Commerce held nine days of hearings addressing child pornography, child safety and

the internet.[1]  In January 2007, that Committee received a bipartisan staff report on the Sexual

Exploitation of Children over the Internet.  The report makes several findings, including that:

- The sexual exploitation of children over the Internet is increasing due to the ease with
  which pedophiles and child predators can trade, sell, view and download images of
  child porn over the internet;

- The number of sexually exploitative images of children over the Internet is
  increasing, the victims are becoming younger, and the substance of the images is
  growing more violent;

- Commercial web sites are growing, and that this is likely to be a multi-billion
  dollar-a-year industry;

- The use of digital photography and web cameras, the ability to communicate
  anonymously over the internet, the use of electronic payments, the limited retention
  of Internet Protocol ("IP") data linked to a subscriber; and the unclear reporting
  requirements for social networking web sites and web hosting companies all limit
  enforcement of existing laws and enable the spread of child pornography.

---

[1]

      Similarly, on January 19, 2006, the Senate Commerce, Science and Transportation
Committee held a hearing to address protecting children on the internet;  on September 19, 2006,
the Senate Banking Committee held a hearing to address combating child pornography by
eliminating pornographers' access to the financial payment system; and the House Judiciary
Committee held a hearing on October 17, 2007 addressing sex crimes and the internet.

Sexual Exploitation of Children Over the Internet, January 2007.  Indeed, data tracked by the National Center for Missing and Exploited Children (NCMEC) verifies that, far from diminishing, the number of images of children in circulation on the Internet has been growing exponentially since NCMEC began its Child Victim Identification Program in 2002, pursuant to 42 U.S.C. § 5773.  Since 2002, law enforcement agencies have been required to provide seized images to NCMEC for analysis, to assist law enforcement in locating and rescuing child victims who have not yet been identified and to help assist prosecutors in obtaining convictions for crimes involving child victims.   In 2002, when the program began, NCMEC analyzed 8,643 images or videos each week.  Currently, NCMEC analyzes an average of 143,000 seized images and videos each week.  Moreover, the total number of identified victims and identified series continues to grow, from 95 identified victims and 73 identified series in 2002 to 1247 identified victims and 832 identified series in 2007.

Congressional action in the child pornography area has been directly related to the increase in child pornography over the internet and the recognition of the harm to the sexual abuse victims depicted in such images.

Defendant received an enhancement for possession of  images of child pornography that depicted prepubescent minors or minors under the age of twelve.  This was an amendment adopted by the Sentencing Commission before the supposed Congressional interference. Amendment 31, effective June 15, 1988; Amendment 325, effective November 1, 1990.  Thus, this enhancement imposed on defendant has been in existence for decades and was created by the Sentencing Commission.  It is a logical attempt to distinguish among child pornography offenders.

Defendant received enhancements for the use of a computer to possess child pornography. In 1995, Congress directed the Sentencing Commission to increase penalties for child pornography defendants who used a computer to commit their offense.  This was a logical response to the increased use of the internet in the possession and distribution of child pornography.  The use of the computer and the internet  has caused an explosion in the amount of child pornography possessed and distributed.   Images and videos of children being molested are distributed worldwide on a daily basis.   Defendant's specific use of the computer--accessing websites that offer child pornography—allows the wholesale sharing of child pornography worldwide.  An enhancement for "use of computer" is appropriate to consider the impact of defendant's conduct.

WHEREFORE, for the foregoing reasons, the Government respectfully requests that the Court sentence defendant to a term of imprisonment of 84 months.

Respectfully submitted,

RICHARD G. CALLAHAN
United States Attorney

*s/ Robert F. Livergood*
ROBERT F. LIVERGOOD, #22937
Assistant United States Attorney
111 S. 10th Street, Room 20.333
St. Louis, Missouri 63l02
(314) 539-2200

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2010, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Adam D. Fein
Rosenblum, Schwartz, Rogers & Glass, PC
120 S. Central Avenue, Suite 130
Clayton, MO 63105
(314) 862-4332


*s/ Robert F. Livergood*
ROBERT F. LIVERGOOD, #22937
Assistant United States Attorney